**Karl ROBERTS, Petitioner,**

v.

**Larry NORRIS, Director of the Arkansas Department of Correction, Respondent.**

**Case No. 5:04CV00004.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Dec. 13, 2007.

Bruce D. Eddy, Jennifer Morris Horan, Julie C. Brain, Federal Public Defender's Office, Little Rock, AR, for Petitioner.

Brent P. Gasper, Kelly K. Hill, Arkansas Attorney General's Office, Jeffrey A. Weber, Gary Eubanks & Associates, Little Rock, AR, for Respondent.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, District Judge.

Presenting a fascinating "exhaustion" issue, this is a case brought by Karl Douglas Roberts ("Roberts") under the federal habeas corpus statute. He seeks to avoid the death penalty. Roberts raises several arguments that he did not present to the Arkansas courts.

Impressed by the fact that Roberts suffered a serious injury to his brain (with a resultant loss of cerebral tissue) when he was a child, and applying *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), I have decided to grant Roberts' motion to "stay and abey."[1] In short, Roberts will be given an opportunity

---

1. To be precise, no separate motion "to stay and abey" was filed. Rather, the "motion" is

to convince the state courts that he did not competently waive his right to appeal and to seek state post-conviction relief.[2] If he is successful, he may then be able to "exhaust" the "unexhausted" claims he presents here by fairly presenting them to the Arkansas courts.

As a result, this federal action will be stayed and not dismissed while Roberts tries to "exhaust" his claims. Here is why.

## I. Background

Much of the essential background is found in two published opinions of the Arkansas Supreme Court. *See Roberts v. State,* 352 Ark. 489, 102 S.W.3d 482 (2003) (*"Roberts I"*) and *State v. Roberts,* 354 Ark. 399, 123 S.W.3d 881 (2003) (*"Roberts II"*). Other information must be dredged from the records.[3] Omitting details that are not pertinent to the "exhaustion" issue, the following is the most significant.

### A. The Murder

It is important not to forget the child that Roberts killed. Because he confessed, and that confession was corroborated, there is little doubt: (1) that Roberts abducted his 12–year–old niece, Andria Brewer, from her parents' residence when they were away; (2) that Roberts drove the child to a secluded spot despite her terrified pleas to be taken home; (3) that he told her that he was going to "fuck her"; (4) that he held her down as she struggled; (5) that he raped her (causing significant bruising to her vagina); (6) that Roberts decided to kill the child because he knew that she could identify him; (7) that he strangled her; (8) that Roberts covered up her body; and (9) that he threw her clothes away. *Roberts I,* 102 S.W.3d at 485–86, 494–495.[4]

As a result of Roberts' confession, the investigators were able to locate the child's body in a secluded spot; Roberts' ability to tell law enforcement where to find the missing girl confirmed the truth of his confession. (Transcripts submitted at filing 28; Respondent's 15 of 22 at page 2262 and Respondent's 16 of 22 at page 2305.) Physical evidence also linked Roberts to the murder. For example, Roberts' green tank top had blood on it. (Transcript submitted at filing 28; Respondent's 16 of 22 at pages 2371–72). According to DNA analysis, the blood on Roberts' tank top matched the victim's blood with a very high degree of confidence. (*Id.* at 2378.)[5]

contained in filings bearing other names. (*E.g.,* filing 35, "Petitioner's Reply to Respondent's Response to Petitioner's Petition for Writ of Habeas Corpus" at CM/ECF page 2; filing 40, "Petitioner's Status Report" at CM/ECF pages 2–3; and filing 46, "Petitioner's Brief In Support of Motion to Stay and Abey.")

2. I express no opinion on what the state courts should do. I merely stay this federal action and hold it in abeyance to avoid a statute of limitations problem. *See Rhines,* 544 U.S. at 274–275, 125 S.Ct. 1528 ("Although the limitations period is tolled during the pendency of a 'properly filed application for State post-conviction or other collateral review,' § 2244(d)(2), the filing of a petition for habeas corpus in federal court does not toll the statute of limitations.") (citation omitted). If I now required the petitioner to dismiss his unexhausted claims to pursue them in the state courts, he could not later return to this court on those claims given the length of time this case has been pending and the one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1)-(2).

3. Because of the way they were assembled, some of the state court records are a nightmare to review. More about that later.

4. The oral confession put to paper by an investigator, signed and initialed by Roberts and witnessed by a FBI agent is in the record. (Transcript submitted at filing 28; Respondent's 20 of 22 at three unnumbered pages near the middle of the transcript and immediately following a page numbered 2894).

5. Perhaps because of decomposition of the poor child's body, the vaginal swabs taken from the victim did not yield any DNA profile. (*Id.* at 2379.)

### B. Roberts' Mental Capacity As Described By the Arkansas Supreme Court

Regarding Roberts' mental capacity, the following information is presented in the opinion of the Arkansas Supreme Court in *Roberts I:*

* At the time of the murder, Roberts was thirty-one years old. *Roberts I,* 102 S.W.3d at 490.

* Testing done by a psychologist for the prosecution (Dr. Mallory) revealed that Roberts had a full-scale I.Q. of seventy-six. *Id.* at 487. That score placed Roberts within the borderline range of intellectual functioning. *Id.*

* According to defense witnesses, Dr. Lee Archer, a neurologist from the University of Arkansas Medical center, and Dr. Mary Wetherby, a neuropsychologist from Texarkana, Arkansas, Roberts had experienced damage to the frontal lobes of his brain when he was hit by a dump truck at age 12. *Id.* Both doctors stated that as a result of the brain injury, Roberts suffered from hallucinations. *Id.* Regarding the specifics of the brain injury, magnetic resonance imaging (MRI) revealed that the accident destroyed one-fifth of Roberts' right frontal lobe and damaged other parts of his brain. *Id.* at 499 (dissent). A significant part of his right frontal lobe, as well as the medial aspect of his left frontal lobe, and part of his temporal lobe, were missing. *Id.* (dissent). While these defense doctors conceded that Roberts knew right from wrong, they believed that Roberts was unable to control his emotions and that lack of emotional control was directly responsible for Roberts raping and murdering the victim. *Id.* at 487.

* Despite the foregoing, Roberts had graduated high school, could read and write on a high school level, held the same job for the six years preceding the murder, and had a wife of ten years and a family. *Id.*

* Dr. Charles Mallory, a psychologist from the Arkansas State Hospital, interviewed Roberts, tested him, and reviewed his medical and psychological records. *Id.* Among other things, Roberts did very well on the Georgia Court Competency Test administered by Dr. Mallory, which measures if a person understands the legal system and the procedures of the trial. *Id.* Dr. Mallory believed that Roberts knew the difference between right and wrong and that he had the ability to conform his conduct to the law. In particular, Mallory came to these conclusions because Roberts was aware of his actions and because he took steps both before and after the killing to avoid apprehension (by driving the girl to a remote location, by raping and killing her, and then covering her body and throwing away her clothes). *Id.* In addition, Mallory also pointed to Roberts' statement that he decided to kill the child because he knew that she could identify him. *Id.*

* Dr. Reginald Rutherford, a clinical neurologist called by the prosecution, gave an opinion that Roberts' brain injury did not cause him to do what he did. *Id.* The doctor explained that Roberts had no dramatic behavioral problems, that Roberts was involved in a complex series of actions that culminated in the crime, and that Roberts' actions demonstrated that he appreciated the criminality of his conduct. *Id.*

In *Roberts II,* the Arkansas Supreme Court reviewed Roberts' waiver as it pertained to post-conviction relief. *Roberts II,* 123 S.W.3d at 881–883. No additional neurologic, psychiatric or psychological information regarding Roberts' mental capacity is presented in that opinion. *Id.*

### C. State Court Time–Line

A time-line, concentrating particularly on the doctors and when certain state court legal proceedings took place, is help-

ful when addressing issues related to the motion to "stay and abey." Therefore, the following chronology is provided.

*May 15, 1999:* Roberts abducted, raped and killed Andria. *Roberts I,* 102 S.W.3d at 485.

*May 17, 1999:* Roberts went to the Polk County Police Station to take a polygraph examination. *Id.* at 498 (dissent). After receiving his *Miranda* warnings, and about four hours after arriving at the police station, Roberts confessed. *Id.* Before he confessed, but after he had been told that a polygraph indicated that he had been deceptive, Roberts began to cry and told the police "he had done something terrible." *Id.* at 488. A police officer responded, "Get if off your chest, we'll help." *Id.* Roberts' confession followed.

*May 18, 1999:* Roberts was charged with "capital murder." (Transcript submitted at filing 28; Respondent's 1 of 22 at an unnumbered page near the beginning of the transcript and immediately following hand-written docket sheets ("Criminal Information").)

*August 9, 1999 through August 12, 1999:* Roberts was examined at the Arkansas State Hospital. (Transcript submitted at filing 28; Respondent's 3 of 22 at an unnumbered page near the end of the transcript ("Forensic Report" at first page of report).) The examination was primarily conducted by Dr. Mallory, a staff psychologist holding a Ph.D. *Id.* (at first page of report under "Sources of Information" and tenth page of report under "Conclusion"). While a neurologist saw Roberts, no imaging studies were conducted. *Id.* (at first and second pages of report under "Sources of Information").

In addition to clinical interviews and other efforts, Mallory administered a variety of psychological tests, including an MMPI.[6] Although the MMPI results suggested bizarre thinking and experiences, depressed mood, anxiety and social avoidance, Mallory did not rely upon the results of that test. *Id.* (at fifth and sixth page of report under "Summary of Psychological Testing"). He did not rely upon the MMPI because validity scales showed that Roberts appeared to be over-reporting psychological problems, appeared to over-endorse personal virtues, and because one scale showed "dissimulation."[7] *Id.* (at sixth page of report under "Summary of Psychological Testing").

Dr. Mallory found that: (1) at the time of the examination, Roberts was competent to participate in court proceedings and to assist his counsel; (2) at the time of the offense, Roberts had the capacity for purposeful conduct, an element of the offense charged; (3) Roberts had the capacity to appreciate the criminality of his behavior; and (4) Roberts had the capacity to conform his conduct to the requirements of the law. *Id.* (at first page of report under "Summary of Opinion").

Dr. Mallory declined to provide an Axis I or II diagnosis and listed "History of Closed Head Injury at age 12" for the Axis III diagnosis. *Id.* In that regard, Dr. Mallory noted and reviewed Roberts' medical history. *Id.* (under "Relevant Medical

---

**6.** The "MMPI is a psychometric test used by medical and psychological professionals to make objective assessments of major personality characteristics that affect professional and social adjustment, such as truthfulness, hypochondria, introversion, depression, and sexual orientation." *Applied Innovations, Inc. v. Regents of the University of Minnesota,* 876 F.2d 626, 628 (8th Cir.1989). For judges who deal with competency issues on a frequent basis, the results of a MMPI are often heavily relied upon because the test is widely used, because it is objectively scored (that is, it requires little subjective interpretation) and because the test can pick up malingering and lying.

**7.** A fancy word for deception.

History" at the third page of the report). Dr. Mallory reported the following information pertinent to Roberts' medical history:

Records obtained from the Sparks Regional Medical Center in Ft. Smith indicated that the defendant was knocked unconscious and suffered a severe head injury at the age of 13 [8] when his bicycle was struck by a dump truck. The records indicate that he showed bizarre behavior and affect due to the closed head injury and improved over several days of inpatient treatment. He was treated from July 17 to August 8, 1980 in the hospital. At one point the treatment note by Dr. Michael Dulligan observed: "His major injury is a skull fracture by skull X-rays. He was knocked unconscious for a period of time. He is alert but extremely belligerent. He has had a complete change of personality based on a blow, probably with bruising to both frontal lobes and to the temporal lobe which we can see obviously." He was noted to initially have headaches and double vision as a result of his head injury. He ambulated on crutches when he was discharged from the hospital. His discharge diagnosis was "Left Frontal Skull Fracture without Depression." He was seen in follow-up visits for the next year and observations and notes about his behavior indicated that he was not having any problems with headaches, seizures, or behavior that would indicate personality changes.

Dr. Earnest Serrano, a neurologist at the Holt–Krock Clinic, indicated that the defendant's parents brought him to that clinic in January 1990 due to their observations that he had uncontrollable temper episodes in which he would "shout, scream, and make obscene gestures at family or people walking down the street." At the time of the examination the defendant admitted that he could not keep his urges of anger under control, but that he did not lose consciousness during the episodes. Dr. Serrano's examination concluded that there were no neurological irregularities and that he thought the symptoms were due to "behavior disorder, situational stress reaction." The defendant was referred to counseling.

*Id.*

*August 13, 1999 and August 24, 1999:* Dr. Mallory's report was prepared and submitted on August 13, 1999. *Id.* (at first page of report under "Identifying Information"). According to the filing stamp on the report, it was received by the Polk County Circuit Court Clerk on August 24, 1999. *Id.*

*September 10, 1999:* As discussed more thoroughly later, Dr. Wetherby, a defense expert, examined Roberts on this date.

*November 18, 1999:* A pretrial hearing on motions, including a hearing to determine whether Roberts was competent to stand trial, was conducted. (Transcript submitted at filing 28; Respondent's 5 of 22 at page 595, and pages 637–683.) Dr. Mallory was the only witness who testified at the hearing and he testified in a manner generally consistent with his report. The judge ruled from the bench that Roberts was competent. *Id.* at 683. (*See also* transcript submitted at filing 28; Respondent's 4 of 22 at the unnumbered page approximately in the middle of the transcript) ("Findings of the Court" at fourth page of document and paragraph 31.)

*February 10, 2000:* As discussed more thoroughly in a moment, Dr. Archer, a

---

8. This appears to be an error. Other evidence, and Dr. Mallory's own report in another section, indicated that the injury occurred when Roberts was 12.

defense expert, examined Roberts on this date.

*May 16, 2000–May, 19, 2000:* After jury selection, a short trial took place, the defendant was found guilty, penalty phase evidence was presented, the jury returned a verdict of death,[9] and Roberts was sentenced to death. (Transcripts submitted at filing 28; Respondent's 15 of 22 beginning at page 2215 through Respondent's 19 of 22 ending at page 2876; Respondent's 22 of 22 beginning at page 2451 and ending at page 2497.) [10]

Roberts' defense was that he was unable to control himself due to his brain injury and related mental problems. (Transcript submitted at filing 28; Respondent's 15 of 22 at 2233 (defense counsel's opening statement; agreeing that "Karl took the life of a 12 year old girl," but asserting that the defendant was not responsible because he could not control himself due to mental problems).) The four doctors previously described gave detailed testimony. Limited to evidence that may illuminate the "stay and abey" question, I note the following.

Dr. Leroy Archer, who is a physician and a medical school professor, testified as a witness for the defense. (Transcript submitted at filing 28; Respondent's 16 of 22 at 2392, 2395.) Archer is a Fellow of the American Academy of Neurology and was voted the best neurologist in Arkansas. *Id.* at 2396. Archer reviewed all the pertinent records and examined Roberts on February 10, 2000. *Id.* at 2398–99.

Among other things, Archer noted that a CAT scan conducted in 1980 showed damage to the right frontal and temporal lobes of Roberts' brain, that intelligence testing later revealed that 95% of the population was smarter than Roberts,[11] and that subsequent MMPI testing showed that "even minor stress" could cause "significant behavioral configurations" in Roberts. *Id.* at 2400.[12] Critically, Archer also examined MRI scans. *Id.* at 2404. According to Archer, these studies clearly revealed that Roberts had lost "a fifth of his right frontal lobe" and a portion of the temporal lobe. *Id.* at 2404, 2408. As a result of these injuries, the doctor stated that Roberts would "[v]ery easily" misunderstand or misinterpret things and that Roberts would "jump to conclusions prematurely, not properly think through a situation[.]" *Id.* at 2411.

Dr. Mary Wetherby, a psychologist, who was awarded a Ph.D. with a speciality in neuroscience, testified for the defense. (Transcript submitted at filing 28; Respondent's 17 of 22 at 2480.) Dr. Wetherby did her internship at the Federal Bureau of Prisons medical center in Lexington, Kentucky. *Id.* About 80 percent of her practice was devoted to treating people who "have some kind of brain dysfunction, some kind of cognitive brain problem[ ]." *Id.* at 2482.

Dr. Wetherby performed a neuropsychological evaluation of Roberts on September 10, 1999. *Id.* at 2483. While her evaluation was conducted before the MRI studies

---

**9.** The nine pages of verdict forms returned by the jury are in the record. (Transcript submitted at filing 28; Respondent's 4 of 22 at eight numbered and unnumbered pages located fourteen pages from the end of the transcript.)

**10.** The written judgment and commitment order was entered on May 23, 2000. (Transcript submitted at filing 28; Respondent's 4

of 22 at two unnumbered pages located five pages from the end of the transcript.)

**11.** However, Archer conceded that Roberts would not be considered mentally retarded. *Id.* at 2435.

**12.** MMPI testing was done both by Dr. Mallory, for the prosecution, and Dr. Wetherby, for the defense, and Archer reviewed the results of all of those tests. *Id.* at 2435–36.

were completed, her evaluation was "real consistent with having problems in the frontal lobes . . . ." *Id.* at 2485–86.

Among other things, Wetherby administered the MMPI to Roberts. *Id.* at 2491. This time, unlike the MMPI administered by Dr. Mallory, the test was valid. *Id.* at 2491, 2493. For subjects like Roberts, Dr. Wetherby testified that authorities in her field believed that it was appropriate and desirable to re-administer the MMPI, particularly if there are problems on the first test with the validity scales. *Id.* at 2492. In any event, the test results revealed that Roberts had a "psychological maladjustment" that was "ongoing." *Id.* at 2493. "[E]ven mild stress" could cause "personality deterioration" in Roberts. *Id.*

In particular, Roberts' results revealed a "chronic pattern" of depression and a tendency to fixate on particular thoughts. *Id.* at 2494. In addition, "his schizophrenia scale [was] elevated as well as the social introversion scale." *Id.* As a result of her examination, and particularly due to the damage to Roberts' frontal lobe, Dr. Wetherby believed that Roberts was likely to be impulsive and likely to misinterpret information coming from others. *Id.* at 2498–2502, 2511–12.

Dr. Reginald Rutherford, a physician and practicing neurologist, was called to testify by the prosecution as a rebuttal witness. (Transcript submitted at filing 28; Respondent's 17 of 22 at 2517, 2520–2521.) Rutherford was engaged in a general neurology practice. *Id.* at 2520.

The doctor reviewed the records, but did not examine Roberts. *Id.* at 2521–2522. According to Dr. Rutherford, "Roberts' MRI scan clearly depicts that he has a large los[s] [of] tissue in the right frontal lobe" and he "has lesser loss of tissue in the left medial frontal lobe and side and he has injury or loss of tissue to the right anterior temporal lobe." *Id.* at 2523. The "anatomy was clear cut." *Id.* According to

the doctor, "it's a significant injury, and it may have significant clinical implications." *Id.* at 2525. When asked by the prosecutor whether Roberts acted impulsively on May 15, 1999, Dr. Rutherford answered: "I don't know. I really don't know why this happened. I can't make any sense of it . . . ." *Id.* at 2530.

Dr. Charles Mallory, a clinical psychologist at the state hospital, was called as a rebuttal witness by the prosecution. (Transcript submitted at filing 28; Respondent's 17 of 22 at 2588.) Dr. Mallory received his Ph.D. from Baylor University in 1973 and since September of 1998 had served on the forensic unit of the state hospital doing evaluations. *Id.* at 2589–2590.

When Mallory conducted the examination of Roberts in the summer of 1999, no MRI studies had been completed. *Id.* at 2593. Furthermore, he acknowledged that the medical records he reviewed when he conducted his evaluation "didn't show the extent of damage that were revealed in MRIs and subsequent diagnoses." *Id.* Nonetheless, Mallory's opinions remained unchanged. *Id.* However, Mallory agreed with defense counsel that Roberts had "anger control and impulse control problems." (Transcript submitted at filing 28; Respondent's 18 of 22 at 2627.)

*June 1, 2000:* Roberts signed the following waiver prepared by his lawyer:

WAIVER OF APPEAL

I, Karl Douglas Roberts, having been found guilty and convicted of the offense of CAPITAL MURDER, and having been sentenced to death by lethal injection following a Jury Trial before a Polk County jury, and having been advised by the Court of my right to appeal, do hereby waive my right to appeal the conviction of Capital Murder and the

sentence of death imposed against me, and in this regards further state:

1. On May 19, 2000, following the announcement by the Court of the jury's verdict, the Circuit Court of Polk County, Arkansas, Honorable Gayle K. Ford, presiding, advised me of my right to appeal and the time limitations in which to perfect an appeal.

2. I have fully discussed with my Attorney the effect of waiving my right to appeal and respectfully request that the sentence of death be carried out without any further action being taken by my attorney by way of direct appeal.

3. I further acknowledge that the proceedings which have been conducted against me not only include the review of possible error on direct appeal to the Arkansas Supreme Court, but also, any post-conviction review following a direct appeal which would review any other matter, including but not limited to, claims of ineffective assistance of counsel.

4. It is my request that no appeal be brought in my behalf and that the Court conduct a prompt hearing to determine my competency to make this waiver.

5. I am not under the influence of any medication or receiving medical treatment that would prevent me from fully understanding the effect of this waiver of appeal.

DATED this 1st day of June, 2000.

s/ *Karl Douglas Roberts*

STATE OF ARKANSAS

COUNTY OF POLK

Subscribed and sworn before me this 1st day of June, 2000.

s/ *Notary Public*

(Seal)

Prepared by:

s/ *Phillip M. Hendry* ABN# [bar number redacted]

Arkansas Public Defender Commission

[address and phone number redacted] (Transcript submitted at filing 28; Respondent's 4 of 22 at two unnumbered pages located three pages from the end of the transcript.)

*July 19, 2000:* Spanning seven pages in the transcript, the record reveals that a brief hearing was conducted on Roberts' "waiver." (Transcript submitted at filing 28; Respondent's 19 of 22 at 2877–2884.) The only evidence that was presented was Roberts' own testimony. Using leading questions, and eliciting short answers (mostly "yes" or "no"), defense counsel called Roberts as a witness and asked him questions regarding the waiver.

Defense counsel's interrogation revealed that (1) after the death sentence, Roberts told his lawyer that he wished to waive his right to appeal; (2) Roberts was informed he had a right to a direct appeal to the Arkansas Supreme Court; (3) Roberts was informed that he would "be able to proceed under Arkansas Rules of Criminal Procedure 37.5 and allege any errors or ineffective assistance"; (4) Roberts was advised that "after that proceeding" he could pursue "avenues in federal court of habeas corpus relief"; (5) Roberts answered "yes" to the question: "Is it your desire to—knowing all that, to waive those matters and waive those issues?"; (6) Roberts answered "yes" to the question: "So, it is your desire not to file a direct appeal or not to pursue Rule 37 or habeas corpus relief, is that correct?"; (7) Roberts answered "no" to the question: "Are you under the influence of any medication or receiving medical treatment which would prevent you from fully understanding the affect of your waiver of appeal?"; (8) Roberts answered "no" to the question: "Are you under the influence of any alcohol or any other substance that may affect your judgment or ability to understand?"; and (9) he signed the written waiver before a

notary public on June 1, 2000. *Id.* at 2878–2880.

The trial judge then briefly interrogated Roberts. While the judge's questions were somewhat more open-ended, Roberts gave very brief answers. The judge's questioning revealed that: (1) Roberts knew that, in his words, appeal "means to let something pass"; (2) Roberts said "yes" to the question: "Do you understand that if you do not have an appeal, that the judgment entered by the Court will be carried out?" (3) Roberts answered "death" when asked: "What is that judgment?"; (4) Roberts answered: "Yes, I am" when asked: "Are you sure?"; (5) Roberts declined to make a statement; (6) Roberts answered "Yes, we did" when asked whether he "fully discussed with your attorneys . . . what we're talking about today?"; (7) Roberts answered "yes" to the question, "Did he tell you that you don't have to do this if you don't want to?"; (9) Roberts was "positive" that he did not want to assert any appeals; (10) Roberts confirmed that he was not under "the influence of any medication or receiving any medical treatment" when he signed the waiver and also on the day of the hearing; and (10) when asked to "tell [the judge] in your own words what your waiver is asking for and what you are asking for today," Roberts replied: "I want to die." *Id.* at 2880–2882.

The prosecutor presented no evidence and asked no questions. Acknowledging that he was "in somewhat uncharted territory," the judge then made a "finding that Karl Douglas Roberts has knowingly and intelligently waived his right to appeal." *Id.* at 2883.[13]

*February 7, 2002:* Despite the fact that Roberts had waived his right to appeal, and pursuant to *State v. Robbins,* 339 Ark. 379, 5 S.W.3d 51 (1999), the Arkansas Supreme Court appointed new counsel to "abstract" the record and directed counsel to brief errors. *See Roberts II,* 123 S.W.3d at 881 ("On February 7, 2002, this court issued a per curiam opinion in which we appointed Tim Buckley to abstract the brief and set out any points of error." [14]).

*October 30, 2002:* Buckley filed an "Abstract, Brief and Addendum of Special Assistant to the Court." (Filing 28; first document in separate envelope containing internal typewritten page numbers only.) He summarized the case in great detail, and included quotations from most of the waiver hearing. *Id.* at typewritten page 157. He also asserted four arguments and they were: (1) the trial court erred when it refused to suppress the defendant's statement as a product of an involuntary waiver of his rights due to a false promise by police officers, *id.* at 164; (2) the trial court erred by denying defendant's motion to suppress physical evidence as fruit of the poisonous tree, *id.* at 167; (3) the trial court erred by not excusing for cause juror Glenda Gentry after the defense exhausted all peremptory challenges, *id.;* and (4) the trial court erred by denying the defendant's motion for a directed verdict at the sentencing phase. *Id.* at 169.

Buckley did not argue that Roberts' waiver of appeal was involuntary or otherwise improper. Nor did Buckley provide any critical analysis of the waiver hearing or Roberts' state of mind at the time of the waiver hearing. Still further, I cannot determine from the record whether Buckley

---

13. As was true throughout the proceedings in the state trial court, the transcript of the waiver hearing reveals that there were spectators in the courtroom. *Id.* at 2878. This may be especially relevant given the outburst that oc-

curred during a subsequent hearing. That event will be discussed later.

14. So far as I can tell, the February 2, 2002 opinion appointing Buckley was not published.

consulted Roberts before making his written submission.

*April 10, 2003: Roberts I,* 102 S.W.3d at 482, was decided.[15] The Arkansas Supreme Court first took up the question of whether Roberts had given a knowing and intelligent waiver of appeal rights. *Roberts I,* 102 S.W.3d at 486–488. The court concluded that "the trial court did not clearly err in determining that Roberts knowingly and intelligently waived his rights to appeal." *Id.* at 488.

The court then took up the four specific issues raised by Mr. Buckley. It resolved those issues against Roberts. *Id.* at 488–495.

The court then examined the record for other errors and also to determine whether Roberts' trial had included "fundamental safeguards." The court found no errors and found nothing in the record that would call into question "the essential fairness of the process afforded Roberts." *Id.* at 495. In particular, the court considered the following when it engaged in this omnibus review:

\* As required by Ark. Sup.Ct. R. 4–3(h) (implementing a statutory directive regarding review of errors in death cases) and Ark.Code Ann. § 16–91–113(a) (West 2007) (requiring review of "all errors prejudicial to the rights of the appellant" in death penalty cases), the court reviewed the transcript for "adverse rulings objected to by Roberts and his counsel" and, without specifying what those rulings were, concluded that "no such reversible errors were found." *Roberts I,* 102 S.W.3d at 495.

\* As required by *State v. Robbins,* 342 Ark. 262, 27 S.W.3d 419, 423 (2000) for death penalty cases in which the defendant waived appeal, the court applied the exceptions to its general rule of not recognizing plain error and examined the record to determine (a) whether the trial court failed to bring to the jury's attention a matter essential to its consideration of death penalty itself; (b) whether there was error by the trial judge of which the defense had no knowledge and therefore no opportunity to object; (c) whether the trial court failed to intervene without objection and correct a serious error by admonition or declaring a mistrial; and (d) whether there was a failure of the trial court to take notice of errors affecting substantial rights in a ruling admitting or excluding evidence, even though there was no objection. *Roberts I,* 102 S.W.3d at 495. The court found no such errors. *Id.*

\* The court then looked to "determine whether other fundamental safeguards were followed" and it found that there was no irregularity. *Id.* In addition, the court responded to and rejected a portion of the lone dissenting judge's opinion which asserted that the verdict forms had not been properly completed because the jury had failed to complete the forms as they regarded seven important mitigating factors. *Compare* 102 S.W.3d at 495–497 (majority) *with* 102 S.W.3d at 501 (dissent). The court believed that there was conflicting evidence on each of the seven proposed mitigating factors for which the verdict forms were left blank, and thus no error occurred when the jury failed to complete the forms. *Id.* at 495–497.

Finally, and because the court had earlier decided that Roberts' statement to the police had been properly obtained, the majority did not directly respond to the dissent's disagreement on that point. *Com-*

---

**15.** The record in this court does not disclose whether the State of Arkansas submitted a brief or other information to the Arkansas Supreme Court. Furthermore, the record does not disclose whether the Arkansas Supreme Court heard oral argument on the matter.

*pare* 102 S.W.3d at 488–492 (majority) with 102 S.W.3d at 497–500 (dissent).

*May 1, 2003:* The mandate of the Arkansas Supreme Court was filed with the local court. (Filing 49 at CM/ECF page 20.)

*May 20, 2003:* A hearing, where Roberts appeared in person, was held in the Polk County Circuit Court pursuant to Ark. R.Crim. P. 37.5 (hereafter Rule 37.5). (Filing 49 at CM/ECF pages 26–43 (hearing transcript).) Among other things, this rule requires that "not later than twenty-one (21) days after the mandate is issued" the "person under sentence of death shall be present at [a] hearing" and the court shall "inform the person of the existence of possible relief under this rule" and "determine whether the person desires the appointment of an attorney ...." Rule 37.5(b)(2).

As contrasted with the judge who tried Roberts' case and who presided over Roberts' initial waiver hearing, a different judge conducted the Rule 37.5 hearing. (Filing 49 at CM/ECF page 34.) Indeed, the judge stated, "I was not the judge [at the time of the trial and the waiver hearing], so, I had to do this by looking at the transcript." *Id.*

In the presence of the prosecutor, the judge began the hearing with the following statement and questioning of Roberts:

BY THE COURT: Court will be in session. We're here on the matter of CR–99–70, State of Arkansas versus Karl Douglas Roberts. Let the record reflect that Mr. Roberts is in the courtroom. Mr. Roberts, the hearing today is for a number of reasons, most importantly is to consider some rights that you may have under Rule 37.5 of the Arkansas Rules of Criminal Procedure. To get to that, let me review for you what has occurred up to now. I was not the judge that presided over your trial and so part of this is for my benefit as well as for yours.

On May 19, 2000, you were sentenced to death by lethal injection for capital murder of Andrea (sic) Brewer in this courtroom and that was by a jury which unanimously found that you had committed the crime and should receive the sentence of death.

On June 13, 2000 you filed with the court a written waiver of appeal requesting that the death sentence be carried out without an attorney taking further action to challenge the sentence.

On July 19, 2000 a hearing was held before the Court regarding that waiver. You testified at that time and made it clear that it was your wish, after being fully advised of all your options, to forego any challenge to your sentence.

BY MR. ROBERTS: Yes.

BY THE COURT: The Court at that time found that your waiver was knowing and intelligence—intelligently given. Under the Rules of Arkansas Criminal Procedure, your sentence was automatically reviewed by the Arkansas Supreme Court both with regard to the waiver of appeal rights, but also with regard to the trial itself to determine whether or not any reversible error had occurred during that trial.

On April 29th of this year the Arkansas Supreme Court issued a mandate affirming the capital murder conviction and upheld the death sentence pursuant to their mandatory review. That mandate from the Supreme Court was filed with the Polk County Circuit Clerk on May 1, 2003. The rules require that within twenty-one days of that filing that this hearing be held and we're here today to conduct this what is referred to often as a Rule 37.5 hearing.

The primary purpose, Mr. Roberts for the hearing today is to determine wheth-

er or not you wish to have an attorney appointed to assist you at this time to pursue any possible post conviction rights and relief that you might have under the Arkansas Rules of Criminal Procedure. That could include also a look at whether or not there's any federal relief available to you under federal law, the federal habeas procedures. What that really amounts to is that you have the right, now that your conviction has been upheld by the court, you have the right within ninety days after whatever order I issue today, to file a petition with this Court asking for review of certain matters with regard to your sentence. I must inform you that those are not matters that were taken up on appeal, that's all been handled and you are at this point of course facing not only a confirmed conviction, but a sentence of death by lethal injection. But, you have the right to have this Court review any matters with regard to things that are outside what was reviewed on the appeal. For example, you have the right to raise questions about the assistance of counsel that you received during your trial, whether or not that was effective and as I've already suggested, there may be federal rights that also go with that. And, so, our point here today is to determine whether or not you wish to have an attorney appointed to represent you in these post conviction matters. Before I can make that decision, I'll have to hear from you and ask you a number of questions with regard to that. I also will have to make the determination of whether first of all your indigency status and you can answer this for me right there, you had appointed counsel during the trial. I am assuming, without knowing, that your financial situation is no different than it was at the time of the trial that you would qualify for an appointment of counsel, is that correct, sir?

BY MR. ROBERTS: Yes, sir.

BY THE COURT: All right, and I'm basing that on the fact that these procedures require that if you desire, an attorney can be appointed for you at no cost to you, if you are in fact indigent and my assumption I'm sure is correct, that you still are going to qualify.

Now, let me ask you, Mr. Roberts, just as a general question without getting into specifics at this point, do you wish to have an attorney appointed to represent you at this stage?

BY MR. ROBERTS: No.

BY THE COURT: All right, that's a preliminary answer and I need to make further inquiry. To do that, Mr. Roberts, I think the best way for me to do this is to ask you to take the stand and take the oath so that I can ask you some questions under oath.

BY MR. ROBERTS: All right.

*Id.* CM/ECF pages 27–31.

After Roberts took an oath, the judge proceeded to conduct a further inquiry. The judge first determined that nothing had changed regarding Roberts' eligibility for the appointment of counsel; that is Roberts was eligible for the appointment of counsel because he was a poor person. *Id.* at CM/ECF page 32. When asked whether Roberts wanted "to have an attorney appointed to represent you with regard to the post-conviction relief matters," Roberts said, "No." *Id.*

Roberts answered "Yes" to the question: "Do you understand that the legal consequences of this decision of not having an attorney appointed is that you are effectively waiving any rights to seek further relief?" *Id.* The judge then questioned Roberts regarding his understanding of his right to appeal and to seek post-conviction relief, and Roberts affirmed that he did not wish to have anyone seek post-

conviction relief on his behalf. *Id.* at CM/ECF page 33. Roberts stated that he understood that an execution date would be set if counsel were not appointed and the Arkansas Supreme Court reviewed the case and found nothing amiss. *Id.*

The judge summarized the prior psychiatric and psychological testimony, and then asked: "Do you feel that your decision making ability, your ability to understand, your ability to make a waiver in this case is any different today than it was at the time of your trial and post-trial hearing?" *Id.* at CM/ECF pages 34–35. Roberts answered, "No, nothing's changed." *Id.* at CM/ECF page 35. Roberts also answered in the negative when asked whether he "had [taken] any medication or substance, is there anything at all that would affect your thinking today?" *Id.* Roberts then stated that he understood that "waiver ... means that I'm not going to file for further actions and that means that I'm going to go on ahead and carry out my sentence." *Id.*

The judge then asked the following questions and Roberts gave the following answers:

BY THE COURT: All right, sir, and tell me in your own words, as you told Judge Ford [the trial judge]. What is it that you want to happen, to occur at this point?

BY MR. ROBERTS: Well, I don't think a guilty person should be allowed to live or he should at least be able to accept responsibility, his punishment whatever it may be.

BY THE COURT: And, do you understand that if you accept that punishment in your case, that means that you are not choosing to live.

BY MR. ROBERTS: Right.

BY THE COURT: Is that what you're asking?

BY MR. ROBERTS: Yes.

BY THE COURT: Do you understand that once the Governor sets that date, then you are—you are choosing death over life under these circumstances.

BY MR. ROBERTS: Yes, sir.

BY THE COURT: I don't want to just go over this over and over, Mr. Roberts, but we're trying to be very careful here and make sure that you fully understand everything that's happening and the legal consequences of your decision. I'll review it for you one more time. Do you understand you would have the right for me to appoint an attorney to represent you at this stage?

BY MR. ROBERTS: Yes, sir.

BY THE COURT: And, I'm understanding that you're saying you do not [want] that attorney.

BY MR. ROBERTS: Yes.

BY THE COURT: Do you understand that that attorney could seek relief in this Court within the next ninety days, that means file a petition on your behalf asking the Court to review any matters that you wanted to bring up, really, other than those that have already been handled in your appeal. Do you understand you're giving up that opportunity?

BY MR. ROBERTS: Yes.

BY THE COURT: Do you understand that also includes some federal rights? You might have the opportunity to go into federal court and ask the federal courts to review some of the conduct of your trial and other matters since your trial. Do you understand you're giving up that right?

BY MR. ROBERTS: Yes.

BY THE COURT: You also have indicated to me that—and I believe you understand what a waiver is and that

you are knowingly giving up and waiving these rights that you have.

BY MR. ROBERTS: Yes, sir.

BY THE COURT: And, you know the consequences.

BY MR. ROBERTS. Yes, death.

*Id.* at CM/ECF pages 35–37.

After the foregoing discussion, the judge inquired of the prosecutor whether the court should ask any additional questions. *Id.* at CM/ECF page 38. The prosecutor responded, "I don't believe so, your honor." *Id.* The judge then found that Roberts had waived his right to appointment of counsel and to seek post-conviction relief. *Id.* at CM/ECF pages 38–39.

Following the judge's oral finding of waiver, the petitioner tried to make a statement to the families, people in the crowd objected, and the judge silenced Roberts telling him to talk to the prosecutor. In particular, the transcript reveals the following:

BY THE COURT: Is there anything else you want to say?

BY MR. ROBERTS: I'd like to say a couple of words to these families, if I would be able to.

A VOICE FROM THE AUDIENCE: No.

BY THE COURT: They don't want to hear it, Mr. Roberts and since they object—

(VOICES FROM THE AUDIENCE)

BY THE COURT: Talk with Mr. Williamson about that. Anything else, Mr. Williamson?

BY MR. WILLIAMSON: Your Honor, I think formally, even though there's not an execution date set, since his—

BY THE COURT: Hold up just a second (Noise from the audience).

BY MR. WILLIAMSON: Since his—since his direct appeal issues were waived, the conviction has been affirmed under a mandatory review and the death sentence has been upheld, I think technically the Court should also enter an order staying any execution. We just need to be sure that's on the record.

BY THE COURT: Thank you for reminding me. Mr. Roberts I have to just make that formal—that is for the Supreme Court to have an opportunity to review today's hearing. So, I will make as part of that order, the execution will be stayed until such time as the Supreme Court directs us to proceed.

BY MR. ROBERTS: Okay.

BY THE COURT: All right, that's it, folks, thank you.

*Id.* at CM/ECF pages 39–40.[16]

*May 22, 2003:* The judge who presided over the Rule 37.5 hearing entered a written order. In pertinent part, that order is reproduced below:

1. That the Court finds on May 19, 2000, the Defendant was convicted by a jury of one count of Capital Murder and sentenced to death by lethal injection.

2. That the Court finds on June 13, 2000, a Waiver of Appeal of said death sentence was filed by the Defendant requesting that his death sentence be carried out without his attorneys taking any further action to challenge his conviction or sentence.

3. That the Court finds on July 19, 2000, a hearing was held regarding said Waiver of Appeal in which the Defendant testified and made it clear that it was his own wish, after being fully advised of his options, to forego any challenge to his death sentence, and that

---

**16.** I note the outburst because there is evidence that Roberts might act impulsively when placed in a stressful situation. The expressed hostility of the spectators is certainly suggestive of a particularly stressful situation.

said waiver was knowingly and intelligently made by the Defendant.

4. That the Court finds on April 29, 2003, after completing a mandatory review for any prejudicial errors at trial regarding the conviction and sentence of the Defendant, the Arkansas Supreme Court issued its mandate affirming the Capital Murder conviction and death sentence of the Defendant and affirmed the finding of competency of the Defendant to waive his appeal from his sentence of death, with said mandate being filed with the Polk County Circuit Clerk on May 1, 2003.

5. That the Court finds on May 20, 2003, the Defendant was present at a hearing regarding the appointment of an attorney as required by Rule 37.5 of the Arkansas Rules of Criminal Procedure with said hearing being conducted within twenty-one (21) days after said mandate was issued by the Arkansas Supreme Court.

6. That the Court finds at said hearing the Defendant was advised that all previous hearings, jury trial, and Waiver of Appeal hearing which were held in this matter were presided over by Circuit Judge Gayle Ford, who is now retired.

7. That the Court finds at said hearing the Defendant was advised that careful consideration and review was recently conducted by the Court prior to this hearing of the court docket; transcript of trial testimony of Charles Mallory, Ph.D., a staff psychologist with the Arkansas State Hospital; the trial testimony of Reginald John Rutherford, M.D., a neurologist; transcript of the trial testimony of Lee Archer, M.D., a staff member of the University of Arkansas Medical Sciences in Little Rock; transcript of the trial testimony of Mary M.C. Wetherby, Ph.D., a psychologist; transcript of the trial testimony of Danny Davis, former employer of the Defendant; transcript of other trial testimony pertinent to the competency of the Defendant; the contents of the Waiver of Appeal and transcript of the hearing held regarding said waiver; and the Arkansas Supreme Court opinion affirming the capital murder conviction and death sentence and affirming the finding of competency of the Defendant to waive his appeal from his sentence of death.

8. That the Court finds at said hearing the Defendant was personally informed of the following facts, to wit:

a. the Defendant was advised of the post-conviction relief available to him pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure and that a petition seeking such relief must be filed with the Circuit Court within ninety (90) days from the date of entry of this order; and, .

b. the Defendant was advised of his right to have an attorney appointed at no charge to represent him in proceedings pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

c. the Defendant was advised that if he has sustained no change in his financial status, he would continue to be declared indigent and entitled to the appointment of an attorney at no charge to him; and,

d. the Defendant was advised of his right to appeal the denial of any post-conviction relief and has the right to pursue certain remedies which may be applicable to him pursuant to habeas corpus relief in federal court; and,

e. the Defendant was advised of his right to reject and waive the appointment of an attorney to represent him in proceedings pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

f. the Defendant was advised of his right to waive the filing of any proceed-

ing for post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

g. the Defendant was advised that exercising his right to waive the filing of any proceeding for post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure could impair his ability to seek habeas corpus relief in federal court; and,

h. the Defendant was advised that his waiver and willful failure to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure would result in the death sentence being carried out against him.

9. That after having advised the Defendant of his rights and facts set forth above, the Court took sworn testimony from the Defendant, and based upon the verbal responses and comments made by the Defendant, the Court hereby makes the following findings, to wit:

a. the Defendant has the capacity and is clearly competent to understand the choice between life and death; and,

b. the Defendant has the capacity and is clearly competent to knowingly and intelligently waive any and all rights to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure or habeas corpus relief in federal court; and,

c. the Defendant has the capacity and is clearly competent to knowingly and intelligently reject his right to have counsel appointed at no charge to him to pursue on his behalf post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

d. the Defendant has unequivocally expressed his desire to freely, voluntarily, knowingly, and intelligently reject his right for the appointment of an attorney at no cost to him and waive his right to pursue post-conviction relief pursuant to

Rule 37.5 of the Arkansas Rules of Criminal Procedure; and,

e. the Defendant has completely demonstrated he fully understands the legal consequences of (i) his waiver of his right to have an attorney appointed to him, (ii) the waiver of his right to pursue post-conviction relief pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure, and the waiver to pursue habeas corpus relief in federal court; and,

f. the Defendant has unequivocally expressed his desire for his death sentence to be carried out by the State of Arkansas and to die by lethal injection.

10. That these written findings and order is filed in compliance with the provisions of Rule 37.5(b) of the Arkansas Rules of Criminal Procedure and as required by Rule 37.5(g), a stay of execution of the sentence of death against the Defendant shall be and hereby is ordered and shall remain in effect until dissolved by a court with competent jurisdiction or by operation of law.

11. That the Court Reporter is hereby ordered to prepare the complete transcript of this hearing forthwith.

12. That the Circuit Clerk shall be and hereby is ordered to forward a copy of this Order pursuant to A.R.Cr.P. Rule 37.5 to Attorney General Mike Beebe forthwith.

(Filing 49 at CM/ECF pages 22–25 (order).)

*October 9, 2003:* In a per curiam opinion, the Arkansas Supreme Court reviewed the Rule 37.5 hearing record and affirmed the lower court's findings. *Roberts II,* 123 S.W.3d at 883. Thus, the court ruled that Roberts had waived his right to an attorney and to seek state post-conviction relief.

### D. The Federal Habeas Corpus Case

On January 6, 2004, Roberts, through the Arkansas Federal Public Defender, filed a motion to stay his execution (filing 1) and that motion was granted on that same day by Judge Howard. (Filing 4.) The stay of execution was subsequently extended (filing 12) and then indefinitely extended on July 23, 2004.[17] (Filing 21.)

On March 29, 2004, Roberts filed a personal declaration stating that "I want the Federal Public Defender Office to pursue my federal habeas case" and "I authorize the Federal Public Defender Office to prepare and file with the Court all appropriate pleadings in my name." (Filing 10 at CM/ECF page 12.) On June 24, 2004, Judge Howard granted (filing 17) Roberts' motion (filing 14) for a psychological evaluation.

On July 16, 2004, Roberts' counsel filed a petition for writ of habeas corpus. (Filing 19.) Roberts asserted the following twenty-two claims:

Claim 1: Petitioner's statement was taken in violation of the Fifth, Sixth, and Fourteenth Amendments, requiring that his conviction and death sentence be vacated.

Claim 2: Mr. Roberts' death sentence should be vacated since there was a failure to life-qualify the jury.

Claim 3: The sentencing provisions of Arkansas' capital murder statutes are unconstitutional.

Claim 4: The overlap between capital murder and first degree murder under Arkansas law is unconstitutional.

Claim 5: The trial court violated Roberts' due process rights by erroneously failing to exclude jurors, thus depriving Roberts of his full complement of peremptory challenges and forcing upon him a juror whom he did not accept.

Claim 6: Petitioner's death sentence violates the Eighth and Fourteenth Amendments because he is mentally retarded.

Claim 7: Petitioner is entitled to relief from his death sentence because the jury failed to consider mitigating circumstances.

Claim 8: Petitioner's death sentence should be vacated because juror failed to accept responsibility for her verdict.

Claim 9: Petitioner's death sentence must be vacated since the jury considered arbitrary, improper, and capricious aggravating circumstances.

Claim 10: Petitioner's conviction and death sentence must be vacated because individuals on the jury did not meet the constitutional standards of impartiality.

Claim 11: Petitioner's conviction and death sentence should be vacated due to juror's consideration during deliberations of information extraneous to the trial record.

Claim 12: Petitioner's conviction and sentence should be vacated because of prejudicial atmosphere in the courtroom.

Claim 13: Petitioner's death sentence must be vacated because of improper communications with the bailiff during sentencing deliberations.

Claim 14: Petitioner's death sentence should be vacated because of improper argument by the prosecutor.

Claim 15: Petitioner's conviction and death sentence should be vacated because of prosecutorial misconduct.

Claim 16: Petitioner's conviction and death sentence should be vacated because

---

**17.** The respondent appealed the first stay of execution. However, the Court of Appeals later dismissed that appeal as moot because the respondent had failed to object to the subsequent stays. (Filing 37 (attached opinion).)

of the unfairly prejudicial atmosphere of the community from which the jury was selected.

Claim 17: Lethal injection in Arkansas violates the First, Eighth, and Fourteenth Amendments.

Claim 18: Petitioner's death sentence should be vacated because counsel was ineffective for failing to adequately investigate, develop, and present mitigating evidence.

Claim 19: Mr. Roberts was not competent at the trial, direct appeal, and postconviction proceeding stages and prior counsel provided ineffective assistance on these matters.

Claim 20: Petitioner's "waiver" was unconstitutional.

Claim 21: Petitioner is entitled to relief because of the cumulative prejudicial effect of the errors described herein.

Claim 22: Roberts' conviction and death sentence should be vacated because counsel were ineffective at trial, sentencing, direct appeal, and post-conviction proceedings.[18] *Id.*

On November 4, 2004, and as directed by Judge Howard, the respondent filed a response, certain state court "transcripts"[19] and various "other" records.[20] (*See* filing 28 and text entry for filing 28.[21]) The parties also filed briefs. The respondent's "surreply" was the last brief submitted and it was filed on May 16, 2005. (Filing 36.)

At about the same time as the parties' initial briefing was coming to an end in the spring of 2005, the Supreme Court of the United States decided *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). In that case, the Court reversed a decision of our Court of Appeals. The Court held that a district court had discretion to stay a mixed habeas petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then return to federal court for review of his perfected petition.

Until the summer of 2005, the parties and Judge Howard apparently awaited a decision from the Court of Appeals on the respondent's appeal of the original stay of execution. As noted earlier, the Court of Appeals dismissed that appeal as moot. It

18. In the petition, Roberts used Roman numerals to describe his claims. Ever the barbarian, and for the sake of clarity, I have used regular numerals instead.

19. There are 22 volumes of "transcripts." In addition to court testimony, some of the "transcripts" contain pleadings, exhibits or other documents. These "transcripts" were submitted by the respondent using exhibit stickers 1 through 22. Unfortunately, some of the "transcripts" are not sequentially paginated. They were not uploaded to the CM/ECF system, so there are no CM/ECF page numbers. Moreover, the "index" submitted with these "transcripts" is simply not accurate.

20. These "other" records (held by the Clerk in a separate envelope) contained copies of a brief and pleadings and other documents. Like the "transcripts," they are not sequen-

tially paginated (although some are internally paginated) and they were not uploaded to the CM/ECF system, so there are no CM/ECF page numbers.

21. Because these "transcripts" and "other" records are not sequentially numbered, it is extremely difficult to accurately cite to them. I have done the best I can to pinpoint where the information cited may be found in the record. That said, in the future, counsel would be well advised to use a "Bates" stamp system or some other method that permits clear and accurate citation to a sequentially numbered page. Alternatively, if records are converted to PDF format and uploaded to CM/ECF, the system will automatically provide sequentially numbered pagination for those records. In addition to sequentially numbering pages, it would be helpful if an accurate index is submitted with any deposit of records.

did so on July 18, 2005. (Filing 37.) After that, and perhaps because of Judge Howard's ill-health, the case remained dormant until the spring of 2007.

Following the death of Judge Howard on April 21, 2007, this case was assigned to me pursuant to order of Chief Judge Loken, of the United States Court of Appeals for the Eighth Circuit, dated May 11, 2007. (Filing 38.[22]) Subsequently, I consulted counsel and entered various orders further progressing this case.

The parties recognized that they had not adequately briefed this case with *Rhines* in mind. (Filing 40 at CM/ECF pages 4–5 (Petitioner's status report); filing 41 at CM/ECF pages 3–4 (Respondent's status report).) Thus, and by agreement of the petitioner and the respondent, the "stay and abeyance" question was extensively addressed for the first time in the summer and fall of 2007. (Filings 46, 47 and 53 (briefs).) That issue became ripe for decision on December 6, 2007.

In the petitioner's reply brief, counsel requested an evidentiary hearing on whether Roberts was competent to waive his right to appeal and seek post-conviction relief "assuming arguendo that Mr. Roberts' Motion [to stay and abey] cannot be granted without resolving [that question]." (Filing 53 at CM/ECF page 3.) On December 5, 2007, I conferred by telephone with counsel for the petitioner and counsel for the respondent. During that discussion, the petitioner's counsel orally withdrew the request for an evidentiary hearing.

I understood the lawyers for the petitioner and the respondent to agree with me that the ultimate question regarding whether Roberts was competent to waive his appeal rights and post-conviction rights in state court is not properly before me at this time. Rather, the question now before me is whether the petitioner has

shown good cause to believe that he may have been incompetent such that I should exercise my discretion under *Rhines*. For that question, both sides agreed that no federal evidentiary hearing is needed.

Furthermore, and at my direction (filing 48), the parties have also submitted additional documents. That additional documentation includes the following information:

* The state court records regarding the waiver hearing on May 20, 2003 had inadvertently been omitted by the respondent. The respondent was ordered to provide the records, and he has done so. (*See* filing 49.)

* The parties were ordered to state, without argument, what claims had been exhausted and what claims had not been exhausted. They have done so. (*Compare* filing 50 (respondent's statement of exhaustion) *with* filing 52 (petitioner's statement of exhaustion).) While the parties disagree on precisely what claims have been presented to the state courts, the respondent concedes that portions of some of the claims have been exhausted. (*See* filing 50 at CM/ECF page 3.)

* In the petitioner's opening brief, the petitioner alluded to "new evidence" showing that Roberts' waivers were "the product of depression and psychosis rather than an exercise of free will." (Filing 46 at CM/ECF page 14.) I ordered the petitioner's counsel to submit affidavits from individuals with personal knowledge explaining this "new evidence." In response, counsel filed the affidavit of Josh Lee, an Assistant Federal Public Defender with the Arkansas Federal Public Defender's Capital Habeas Unit. Counsel for the petitioner requested that the affidavit be considered ex parte and in camera in order to protect the attorney-client privilege and

---

**22.** This order was filed in the records of the   Eastern District of Arkansas on May 16, 2007.

the work-product privilege. I granted that request. After considering the affidavit, I conclude that the petitioner's lawyer has provided a convincing explanation about why counsel cannot now comply with my earlier order to submit affidavits from individuals having personal knowledge of the "new evidence." That said, I stress that I have accorded no other significance to Mr. Lee's affidavit. In particular, I have not considered that affidavit on the merits of the question pending before me. Therefore, I take the statement in the petitioner's earlier brief that there is "new evidence" as an assertion of the petitioner's counsel, unsupported at present by affidavits from people with personal knowledge.

## II. Analysis

The primary legal question before me is whether I should exercise the discretion given to me by *Rhines,* 544 U.S. at 275–278, 125 S.Ct. 1528 (a federal district court has discretion to stay a mixed habeas petition containing exhausted and unexhausted claims to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition; setting out three considerations a judge should examine when exercising such discretion: (1) whether there is "good cause" for the petitioner's failure to exhaust, (2) whether the claims are "plainly meritless" and (3) whether the petitioner has engaged in "intentionally dilatory litigation tactics."). There are, however, preliminary matters that must be resolved before I address the primary issue.

### A. Preliminary Matters

■ Before a judge should exercise his or her discretion under *Rhines,* the judge should be persuaded that three prerequisites exist. They are: (1) the federal ha-

beas petition was timely when filed (even though it would be untimely if dismissed and filed again after exhaustion); (2) the federal habeas petition presents at least one federal claim (or a portion of a federal claim) that has been exhausted, that is, the habeas petition is truly a "mixed" petition; and (3) there is a plausible argument that the petitioner has an available state remedy.

The reasons for these three requirements are simple:

\* Regarding prerequisites one (1) and three (3) above, if the habeas petition was barred by the federal statute of limitations when it was filed or there is no plausible argument that the state courts will hear the petitioner, then it is a waste of time to allow the petitioner to return to state court. Such a waste of time is obviously contrary to the primary goal of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) which seeks to "reduce delays in the execution of state and federal criminal sentences, particularly in capital cases." *Woodford v. Garceau,* 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003).

\* Regarding prerequisite two (2) above, if *none* of the petitioner's claims have been exhausted, then the federal court is not confronted with a "mixed petition" and *Rhines* does not apply as a categorical matter. In other words, *Rhines* dealt only with "mixed petitions" and, therefore, the holding in *Rhines,* strictly construed, applies only to cases involving "mixed petitions." [23]

The petitioner has met each of these three prerequisites. His petition is not barred by the AEDPA's one-year statute of limitations, *see* 28 U.S.C. § 2244(d)(1)-

---

**23.** One might envision a very unusual situation where "stay and abeyance" would be appropriate in a case involving a habeas petition presenting no exhausted federal claims, but, if so, the legal reasoning for such a decision could not be solely based upon the holding in *Rhines.*

(2),[24] and the respondent does not contend otherwise. Roberts' petition is "mixed" and the respondent concedes that point. (*See* filing 50 at CM/ECF page 3.) Lastly, there is a plausible argument that the state courts of Arkansas will hear the petitioner's belated claims. Regarding the availability of a state remedy, slightly more discussion is warranted.

Arkansas Rule of Criminal Procedure 37.1 provides for post-conviction relief for persons convicted of a crime. Ark. R.Crim. P. 37.1 (hereafter Rule 37.1). Rule 37.5, pertaining to capital cases, incorporates Rule 37.1 by reference. Ark. R.Crim. P. 37.5(a) (purpose and scope). There are, however, various time limits for post-conviction actions. Ark. R.Crim. P. 37.2(c) (setting time limits depending upon the method of conviction and whether a direct appeal was taken; the time limits are 60 or 90 days depending upon the circumstances).

Roberts, assuming that a 90 day limit applies, concedes that a state post-conviction action under Rule 37.1 and Rule 37.5 would, as a technical matter, be untimely. (*See* filing 46 at CM/ECF page 6 (brief).) However, based upon numerous state cases, the petitioner argues (filing 46 at CM/ECF pages 6–11 (brief, collecting cases)) that the Arkansas Supreme Court has not enforced time limits in Rule 37.5 proceedings where "good cause" for doing otherwise has been shown.[25] *See, e.g., Porter v. State,* 339 Ark. 15, 2 S.W.3d 73 (1999) (recognizing that the purpose of a meaningful state review is to eliminate the need for multiple federal habeas corpus proceedings in death cases and applying a "good cause" standard to an untimely post-

conviction petition in a capital case; "good cause" was shown where it was possible that the petitioner did not actually have counsel (due to a funding problem with Arkansas Capital Resource Center), but the petitioner may have reasonably assumed that counsel was representing him).

I agree with the petitioner that he has shown a plausible argument that there is a state remedy open to him. Noting that the "good cause" standard used by the Arkansas Supreme Court when deciding whether to waive time limits in capital post-conviction cases seems similar to the "good cause" standard discussed in *Rhines,* I next proceed to the "main event."

### B. Whether to Stay and Abey

Before I may grant a stay and hold this case in abeyance to allow Roberts to do what he should have done earlier, I must be satisfied that there is "good cause" for doing so, that Roberts' federal claims are not "plainly meritless" and that Roberts has not engaged in "intentionally dilatory litigation tactics." *Rhines,* 544 U.S. at 277–278, 125 S.Ct. 1528.

#### Good Cause

■ When evaluating the question of "good cause," I could rehash and reformulate the evidence that I have set forth earlier, but that would waste everyone's time. Rather, I simply find and conclude that:

(1) where, as here, there is undisputed evidence that at the time of the waiver of the right to direct appeal and at the time of the waiver of the right to seek post-conviction review the petitioner suffered from a serious injury to his

---

24. The petitioner filed this federal action about four months after *Roberts II* and about nine months after *Roberts I.*

25. Although begrudgingly, the respondent essentially agrees: "Respondent does not argue

with the fact that, in exceedingly limited circumstances, the Arkansas Supreme Court has allowed delayed petitions." (Filing 47 at CM/ECF page 3 (brief).)

brain, including a significant loss of tissue, resulting in demonstrated mental problems, as evidenced by objectively verifiable data such as CAT and MRI scans and MMPI and intelligence testing, and,

(2) where, as here, there is compelling expert trial testimony from prosecuting and defense experts alike from which a reasonable person might infer that mental problems may have caused the petitioner to impulsively, but not rationally, waive his right to direct appeal and to waive his right to seek post-conviction relief, and,

(3) where, as here, it is undisputed that the petitioner did not have counsel who challenged the competency of the petitioner to waive his rights at the time he gave up his right to direct appeal or at the time he surrendered his right to seek post-conviction review,[26] and,

(4) where, as here, the record reveals no neurologic, psychiatric or psychological evaluation of the petitioner *that was current at the time of the waiver* establishing that the petitioner was competent to waive his right to pursue a direct appeal or to seek post-conviction review,

"good cause" under *Rhines* has been shown. Frankly, if the record in this case does not establish "good cause," I am at a loss to understand the meaning of the term.

Relying upon 28 U.S.C. § 2254(e)(1)[27] (regarding the presumption of correctness for factual findings of state courts),[28] the respondent argues that I must presume that the Arkansas Supreme Court was correct when it accepted Roberts' waivers. I reject this argument.

Most fundamentally, section 2254(e)(1) does not apply when a federal district court is considering whether to exercise its discretion under *Rhines* because that is a *federal civil procedure* question and section 2254(e)(1) does not purport to pertain to that kind of a question. That is probably why the respondent cites no cases applying section 2254(e)(1) to "stay and abeyance" issues under *Rhines*.

Still further, I have not rejected any of the historical facts found by the Arkansas Supreme Court. Thus, the presumption in 2254(e)(1), even if applicable, is largely beside the point.

Finally, if section 2254(e)(1) did apply, the presumption of correctness has been clearly and convincingly rebutted by the petitioner for the limited purpose of applying *Rhines*. Given that Roberts never had a lawyer in any of the state waiver proceedings or before the Arkansas Supreme Court who challenged the assertion that he

26. *See O'Rourke v. Endell,* 153 F.3d 560, 567 (8th Cir.1998) (Arkansas state court denied petitioner due process when it failed to appoint an attorney, either as counsel of record or a "next friend," to argue during competency hearing that he lacked the capacity to waive his right to appeal a post-conviction proceeding; state court's determination that he was competent thus was not entitled to presumption of correctness in determining whether waiver resulted in procedural bar to federal habeas relief; petitioner's statement during competency hearing that he wished to be executed failed to demonstrate that he fully understood the consequences of voluntarily waiving appeal).

27. That section states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28. In his brief, the respondent incorrectly refers to 28 U.S.C. 2254(c)(1). (Filing 47 at CM/ECF page 3.)

was competent to make the waivers, rejection of the presumption is strongly supported by Eighth Circuit precedent. *See* *O'Rourke,* 153 F.3d at 567.

### Merits of Federal Claims

Containing 101 pages, experienced death-penalty counsel have submitted a detailed and literate habeas corpus petition. (Filing 19.) None of the claims asserted in that well-written document are "plainly" without merit.

### Litigation Tactics

While Roberts has vacillated, there is no evidence that he was playing games. Frankly, I doubt that he is smart enough to do so. In any event, given Roberts' documented mental problems from which a reasonable person could infer that he acted impulsively and not rationally when he waived his direct appeal and post-conviction rights, I am unwilling to conclude that Roberts engaged in "intentionally dilatory litigation tactics."

### III. Conclusion

Delaying the imposition of the death penalty for a man who is obviously guilty of raping and then killing an innocent child is an act that no judge should undertake lightly. I am especially sensitive to the impact of delay on Andria Brewer's family. In my mind's eye, I see them. They are asking me, "What about Andria?"

The foregoing said, I am also firmly convinced that I would abuse my discretion under *Rhines* if I failed to grant Roberts' request to stay and abey. Indeed, I hope by granting his request that I will ultimately advance the full, fair and final resolution of this case in the shortest possible time. Accordingly,

IT IS ORDERED that:

(1) This case is stayed and held in abeyance until further order of the undersigned. However, I reserve the right to withdraw the stay and abeyance at any time.

(2) By February 1, 2008,[29] the petitioner shall seek relief in the state courts under Rule 37.5 (or otherwise) regarding all unexhausted claims.[30] Thereafter, the petitioner shall proceed with all deliberate speed to exhaust his unexhausted claims. After he has done so, he shall return to this court within thirty days of a final decision by the state courts. At that time, the petitioner shall put into the records of this court the entire state court record and all decisions of the state court regarding the efforts taken by the petitioner pursuant to this order.

(3) My judicial assistant shall arrange a telephone conference call with counsel for the petitioner and counsel for the respondent to discuss the details of a reporting mechanism that will keep me informed of the progress of the state court proceedings. After that conference, I will enter an order requiring periodic reports.

(4) If, at any time, the respondent believes that the petitioner is not proceeding expeditiously, the respondent may seek relief from the stay

---

**29.** The Supreme Court has said that the normal time limit should be 30 days. *Rhines,* 544 U.S. at 278, 125 S.Ct. 1528. I have slightly expanded that period due to the holidays.

**30.** Given the dispute between the petitioner and the respondent about what claims are exhausted and what claims remain unexhausted (*compare* filing 50 (Respondent's statement of exhaustion) *with* filing 52 (Petitioner's statement of exhaustion)), Roberts should seriously consider whether to put before the state courts all claims that the respondent asserts have not been fairly presented. That, however, is a decision left entirely to the petitioner and his very able counsel.

and abeyance by filing a motion in this court supported by a brief.